FILED

2008 AUG 13  AM 8: 46

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____DEPUTY

1   DAMON NAGAMI, Cal. Bar. No. 217089
2   JOEL R. REYNOLDS, Cal. Bar. No. 85276
    Natural Resources Defense Council, Inc.
3   1314 Second Street
    Santa Monica, California 90401
4   (310) 434-2300

5
6   HOWARD M. CRYSTAL, D.C. Bar. No. 446189
    ERIC R. GLITZENSTEIN, D.C. Bar No. 358287
    Meyer Glitzenstein & Crystal
7   1601 Connecticut Avenue, N.W., Suite 700
8   Washington, D.C.  20009
    (202) 588-5206

9
    *Attorneys for plaintiffs*
10
11  [additional attorneys on next page]

12              **UNITED STATES DISTRICT COURT**
              **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
13

14  SAVE SAN ONOFRE COALITION, CALIFORNIA    **'08 CV 1470 JAH RBB**
    COASTAL PROTECTION NETWORK,              )
15  CALIFORNIA STATE PARKS FOUNDATION,       )
    DEFENDERS OF WILDLIFE, ENDANGERED        ) **COMPLAINT FOR**
16  HABITATS LEAGUE, LAGUNA GREENBELT,       ) **DECLARATORY**
17  INC., NATIONAL AUDUBON SOCIETY, INC. d/b/a/ ) **AND INJUNCTIVE**
    AUDUBON CALIFORNIA, NATURAL              ) **RELIEF**
18  RESOURCES DEFENSE COUNCIL, INC., ORANGE  )
19  COUNTY COASTKEEPER, SEA AND SAGE         ) **ADMINISTRATIVE**
    AUDUBON, THE SIERRA CLUB, AND SURFRIDER  ) **PROCEDURE**
20  FOUNDATION,                              ) **ACT CASE**
                                             )
21          Plaintiffs,                      )   Civil Case No.
                                             )
22                                           )
                   v.                        )
23                                           )
24  CARLOS GUTIERREZ, Secretary, Department of )
    Commerce, **JAMES BALSIGER**, Acting Assistant )
25  Admin. for Fisheries, National Marine Fisheries Service, )
    **DIRK KEMPTHORNE**, Secretary, Department of Interior)
26  and **DALE HALL**, Director, Fish and Wildlife Service, )
                                             )
27          Defendants.                      )
                                             )
28

BRIAN SEGEE, Cal. Bar. No. 200795
Defenders of Wildlife
1130 Seventeenth St., N.W.
Washington, D.C. 20036
(202) 772-3221

*Attorney for plaintiffs*

Of counsel:

MICHAEL D. FITTS, Cal. Bar No. 145114
1718 Esplanade #523
Redondo Beach, CA 90277
(310) 947-1908

*Attorney for plaintiff Endangered Habitats League*

ANGELA T. HOWE, Cal Bar. No. 239224
P.O. Box 6010
San Clemente, CA 92674
(949) 492-8170 ext. 414

*Attorney for plaintiff Surfrider Foundation*

Plaintiffs Save San Onofre Coalition, California Coastal Protection Network, California State Parks Foundation, Defenders of Wildlife, Endangered Habitats League, Laguna Greenbelt, Inc., National Audubon Society, Inc., d/b/a Audubon California, Natural Resources Defense Council, Inc., Orange County Coastkeeper, Sea and Sage Audubon, The Sierra Club, and Surfrider Foundation allege as follows:

**INTRODUCTION**

1.      This case concerns the substantial threats that the Foothill Transportation Corridor-South ("FTC-South" or "Toll Road") – a proposed 16 mile highway through one of Southern California's last remaining undeveloped areas, including San Onofre State Beach – poses to the continued existence of several critically imperiled species listed under

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                    2

the federal Endangered Species Act ("ESA"), 16 U.S.C. § 1531, et seq. The ESA and its implementing regulations mandate that the Department of Commerce's National Marine Fisheries Service ("NMFS") and the Department of Interior's Fish and Wildlife Service ("FWS") fully analyze these threats, and the steps necessary to insure that the Toll Road is not likely to jeopardize the continued existence of any of these species, based on the "best scientific and commercial data available." Id. § 1536(a)(2). In contravention of this mandate, NMFS and the FWS, in concluding that the Toll Road is not likely to jeopardize these species, have ignored or downplayed critical issues, and have based their conclusions on speculative and ill-defined mitigation plans.

2.    The Toll Road will cross San Juan and San Mateo Creeks, both of which are federally designated critical habitat for the critically endangered southern steelhead trout. Nonetheless, NMFS refused to even prepare a comprehensive Biological Opinion ("Bi-Op") concerning the impacts of the Toll Road on the southern steelhead, instead concluding that the Toll Road is not likely to adversely affect the species. This conclusion ignored or failed to meaningfully analyze several specific threats to the southern steelhead, and thus violates the ESA and is arbitrary and capricious and contrary to law in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.

3.    The FWS issued a Bi-Op purporting to address the adverse impacts of the Toll Road on several species under that agency's jurisdiction. The Bi-Op acknowledges that Toll Road construction: (a) will destroy and fragment high quality habitat for one of the handful of remaining populations of the critically imperiled Pacific pocket mouse; (b) will disturb almost 50% of the aquatic habitat for the endangered tidewater goby in San Mateo

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                3

1  and San Onofre Creeks; (c) will destroy more than a hundred acres of upland habitat for two

2  populations of the endangered arroyo toad; (d) will eliminate more than 300 acres of the

3  coastal sage scrub habitat occupied by up to 50 breeding pairs of the threatened coastal

4  California gnatcatcher; (e) will destroy more than 22 acres of the remaining habitat for the

5

6  endangered least Bell's vireo; and (f) will wipe out at least one of the limited number of

7  remaining populations of the threatened thread-leaved brodiaea.

8      4.    The Bi-Op also acknowledges that the Toll Road's operation poses

9  continuing risks of "mortality due to vehicular collisions," which has "a significant effect on

10  frogs and toads" – especially those with smaller populations – while also causing harassment

11

12  and other interference with life functions due to "noise, light, dust and other particulates,

13  and exposure to metals such as lead, cadmium, nickel and zinc, and gases such as carbon

14  monoxide and nitrogen-oxygen complexes." The Toll Road will also cause "changes to

15

16  hydrology and water quality" due to runoff and sedimentation, while also increasing fire

17  risks in the area.

18      5.    Rather than find that these substantial threats may jeopardize the continued

19  existence of any of these species, the FWS downplayed their significance by relying on

20  undeveloped and untested mitigation plans, without any assurance that they would provide

21

22  the requisite protections. The FWS also relied on inadequate and outdated surveys rather

23  than the best available science, as required by the ESA. 16 U.S.C. § 1536(a)(2). Finally, the

24  Bi-Op failed to adequately consider the threats already facing these species, and the actual

25  extent of the additional challenges that the Toll Road will pose to their continued survival

26

27  and recovery. For all these of reasons, the FWS's Bi-Op violates the ESA and is arbitrary

28  COMPLAINT FOR DECLARATORY AND
   INJUNCTIVE RELIEF                    4

1    and capricious and contrary to law in violation of the Administrative Procedure Act

2    ("APA"), 5 U.S.C. § 706.

3
       6.    Accordingly, by this action plaintiffs seek an Order setting aside (a) NMFS's
4
5    decision not to prepare any Bi-Op on the impacts of the Toll Road on the southern steelhead

6    trout, and (b) the FWS's Bi-Op concerning the impacts of the Toll Road on the Pacific

7    pocket mouse, tidewater goby, arroyo toad, coastal California gnatcatcher, least Bell's

8
     vireo, and the thread-leaved brodiaea.  Because these decisions permit the construction and
9
10   maintenance of the Toll Road under the ESA, and the Bi-Op further authorizes the killing,

11   harassing and other forms of "take" of these species, setting these decisions aside will

12   protect these species and thus redress plaintiffs' interests in their survival and recovery in the

13   wild.

14
                            **JURISDICTION AND VENUE**
15
16      7.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331

17   (federal question jurisdiction).  Venue is proper in this judicial district pursuant to 28 U.S.C.

18   § 1391(e).

19
                                 **PARTIES**
20
21   A.   **Plaintiffs**

22      8.    Plaintiff Save San Onofre Coalition ("The Coalition") is a collection of non-

23   profit organizations committed to protecting San Onofre State Beach and the aesthetic and

24   recreational opportunities the State Beach and its sensitive habitats and species provide for

25   their members.  The Coalition's members are involved in several advocacy efforts opposing

26   construction of the Foothill-South Toll Road – which will impair their members' ability to
27
28   COMPLAINT FOR DECLARATORY AND
     INJUNCTIVE RELIEF                 5

1  recreate and otherwise enjoy areas where the Toll Road is being constructed, and to observe

2  and appreciate the species inhabiting those areas – and supporting and developing

3  alternatives that will help alleviate traffic congestion while also protecting the environment.

4  For these reasons the Coalition's members are injured by the federal defendants' violations

5  

6  of the ESA and the APA, which threaten these areas and the imperiled species living there.

7      9.    Plaintiff California Coastal Protection Network ("CCPN") is a California

8  non-profit organization dedicated to the protection of the onshore and offshore resources of

9  

10  the California Coast.  CCPN works on precedent setting coastal issues statewide in concert

11  with local communities that seek to protect the resources within their areas with the goal of

12  increasing public understanding and participation in all decision making processes that affect

13  the health and viability of those resources.  CCPN's interests in advocating for the

14  

15  protection of the coastal areas in proximity to the Toll Road are injured by the federal

16  defendants' violations of the ESA and the APA because these violations threaten these areas

17  and the imperiled species living there.

18      10.    Plaintiff California State Parks Foundation ("CSPF") is a statewide nonprofit

19  membership organization with nearly 100,000 members dedicated to protecting, enhancing

20  and advocating for California's 278 magnificent state parks, with its headquarters in San

21  

22  Francisco and offices in Sacramento and Los Angeles.  CSPF advocates for full funding for

23  state parks, and works to prevent threats to parks from encroachments and development,

24  such as the 241 Foothill South Toll Road Extension at San Onofre State Beach and the

25  Sunrise Powerlink project at Anza Borrego Desert State Park.

26  

27  

28  COMPLAINT FOR DECLARATORY AND
   INJUNCTIVE RELIEF                6

11.    CSPF brings this action on its own institutional behalf, and also on behalf of its members, who regularly hike, camp, swim, fish, birdwatch, and otherwise enjoy the flora, fauna and natural beauty in San Onofre State Beach and other areas where the Toll Road is planned to be located.   The ability of CSPF and its members to recreate and otherwise enjoy these areas, and to observe and appreciate the species at issue in their natural habitat, is injured by the federal defendants' violations of the ESA and the APA because these violations threaten these areas and the imperiled species living there.

12.    Plaintiff Defenders of Wildlife ("Defenders") is a national, nonprofit membership organization with more than 500,000 members dedicated to the protection of all native animals and plants in their natural communities, with its headquarters in Washington, D.C.  Defenders is a science-based advocacy organization.  Defenders maintains a Field Office with ten employees in Sacramento, California, has more than 147,000 members and activists in the state, and has a long history of advocating on behalf of imperiled species, including the species that will be adversely impacted by the Toll Road.

13.    Defenders brings this action on its own institutional behalf, and also on behalf of its members, who regularly hike, camp, swim, fish, birdwatch, and otherwise enjoy the flora, fauna and natural beauty in San Onofre State Beach and other areas where the Toll Road is planned to be located.   The ability of Defenders and its members to recreate and otherwise enjoy these areas, and to observe and appreciate the species at issue in their natural habitat, is injured by the federal defendants' violations of the ESA and the APA because these violations threaten these areas and the imperiled species living there.

14.    Plaintiff Endangered Habitats League, Inc. ("EHL") is a tax-exempt, not-for-profit corporation under California law devoted to sustainable land use planning in Southern California and to the preservation of its native species and the ecosystems upon which these species depend. EHL has participated extensively in the environmental review process for the Toll Road.

15.    EHL's core organizational purposes, and the interests of its members – many of whom reside in Orange and San Diego Counties and regularly hike, birdwatch, and otherwise enjoy the flora, fauna and natural beauty in San Onofre State Beach and other areas where the Toll Road is planned to be located – are directly, adversely and irreparably affected by the federal defendants' violations of the ESA and the APA because these violations threaten these areas and the imperiled species living there.

16.    Plaintiff Laguna Greenbelt, Inc., is a charitable, nonprofit membership organization dedicated to the preservation of Orange County's natural open space and wildlife.  Based in Laguna Beach, California, Laguna Greenbelt is supported by a majority of the residents of that City.  For more than forty years Laguna Greenbelt has educated the public about local natural history through guided hikes, self-guiding nature trails, newsletters, and field guides describing the coastal sage scrub ecosystem.

17.    Since 1992 Laguna Greenbelt has trained hundreds of people to be volunteer naturalists throughout Orange County, and has worked to preserve 20,000 acres of coastal open space around Laguna Beach.  Laguna Greenbelt brings this action on its own institutional behalf, and also on behalf of its members, who regularly enjoy areas that will be impacted by the Toll Road.  The ability of Laguna Greenbelt and its members to recreate

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                    8

and otherwise enjoy these areas, and to observe and appreciate the species at issue in their natural habitat, is injured by the federal defendants' violations of the ESA and the APA because these violations threaten these areas and the imperiled species living there.

18.    Plaintiff National Audubon Society, Inc. is a not-for-profit corporation organized under the laws of the State of New York, with its principal office at 225 Varick Street, 7th Floor, New York, New York. Audubon has more than one million members and supporters, offices in many states including California, and a presence in all 50 states through more than 450 certified chapters, nature centers, sanctuaries, and education and science programs. Audubon's mission is to conserve and restore natural ecosystems, focusing on birds, other wildlife, and their habitats for the benefit of humanity and the earth's biological diversity. It carries out that mission through a variety of activities including education, habitat conservation, and public policy advocacy.

19.    Audubon California, the official state office of the National Audubon Society, Inc., works on behalf of Audubon's more than 100,000 members and supporters in the State, who engage in a variety of wildlife observation and conservation activities, including watching and working to protect avian species. Audubon brings this action on its own behalf and on behalf of its members, who enjoy looking for and observing bird species such as the coastal California gnatcatcher and the least Bell's vireo in their natural habitat, including in the areas where the Toll Road is planned to be located. The ability of Audubon and its members to recreate and otherwise enjoy these areas, and to observe and appreciate the species at issue in their natural habitat, is injured by the federal defendants' violations of

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                9

the ESA and the APA because these violations threaten these areas and the imperiled species living there.

20.    Plaintiff Natural Resources Defense Council, Inc. ("NRDC") is a not-for-profit, environmental membership organization with offices in Los Angeles and San Francisco, California; Chicago, Illinois; Washington, D.C.; and Beijing, China; and its headquarters in New York, New York.  NRDC has over 425,000 members nationwide, more than 80,000 of whom live in California.  NRDC's membership and staff of lawyers, scientists, and other environmental specialists have a long-standing interest in protecting the planet's wildlife and wild places, including the areas and species that will be adversely impacted by the Toll Road.

21.    NRDC brings this action on its own institutional behalf, and also on behalf of its members, who regularly hike, camp, swim, fish, and otherwise enjoy the flora, fauna and natural beauty in San Onofre State Beach and other areas where the Toll Road is planned to be located.  The ability of NRDC and its members to recreate and otherwise enjoy these areas, and to observe and appreciate the species at issue in their natural habitat, is injured by the federal defendants' violations of the ESA and the APA because these violations threaten these areas and the imperiled species living there.

22.    Plaintiff Orange County Coastkeeper is a grassroots, nonprofit organization created in 1999 with the mission to preserve, protect, and restore the coastal environment and watersheds of Orange County.  Orange County Coastkeeper's twelve member staff works on behalf of its members to maintain and restore water quality in order to protect marine and freshwater species and habitat.  As one component of that mission Orange

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                    10

1   County Coastkeeper has been working to protect water quality for southern steelhead trout

2   and other aquatic species in San Mateo Creek, which the Toll Road will cross.

3        23.    Plaintiff Orange County Coastkeeper brings this action on its own

4   institutional behalf, and also on behalf of its members, who regularly hike, camp, swim, fish,

5   birdwatch, and otherwise enjoy the flora, fauna and natural beauty in San Onofre State

6

7   Beach and other areas where the Toll Road is planned to be located.   The ability of Plaintiff

8   Orange County Coastkeeper and its members to recreate and otherwise enjoy these areas,

9

10  and to observe and appreciate the species at issue in their natural habitat, is injured by the

11  federal defendants' violations of the ESA and the APA because these violations threaten

12  these areas and the imperiled species living there.

13       24.    Plaintiff Sea and Sage Audubon ("Sea and Sage") is a chapter of National

14  Audubon Society, Inc. with nearly 3,000 local members dedicated to the protection and

15  appreciation of birds, other wildlife, and their habitats through education, conservation,

16

17  scientific research, and volunteer opportunities.  Sea and Sage has been working to protect

18  habitats in Orange County for 50 years, playing a significant role in the protection of coastal

19  sage scrub habitats as participants and supporters of the Natural Communities Conservation

20  Plan (NCCP) and other land use processes.  Sea and Sage advocates for land use planning

21

22  that fairly balances growth with natural resource protection, which has resulted in the

23  dedication and protection of open spaces and parks, including the Donna O'Neill Land

24  Conservancy.

25       25.    Sea and Sage brings this action on its own institutional behalf, and also on

26  behalf of its members, who regularly hike, camp, swim, fish, birdwatch, and otherwise enjoy

27

28  COMPLAINT FOR DECLARATORY AND
    INJUNCTIVE RELIEF                    11

the flora, fauna and natural beauty in San Onofre State Beach and other areas where the Toll

Road is planned to be located.  The ability of Sea and Sage members to recreate and

otherwise enjoy these areas, and to observe and appreciate the species at issue in their

natural habitat, is injured by the federal defendants' violations of the ESA and the APA

because these violations threaten these areas and the imperiled species living there.

26.    Plaintiff The Sierra Club is a national nonprofit organization of

approximately 1.3 million members and supporters dedicated to exploring, enjoying, and

protecting the wild places of the earth; to practicing and promoting the responsible use of

the earth's ecosystems and resources; to educating and enlisting humanity to protect and

restore the quality of the natural and human environment; and to using all lawful means to

carry out these objectives.

27.    The Sierra Club brings this action on its own institutional behalf, and also on

behalf of its members, who regularly hike, camp, swim, fish, birdwatch, and otherwise enjoy

the flora, fauna and natural beauty in San Onofre State Beach and other areas where the Toll

Road is planned to be located.   The ability of The Sierra Club members to recreate and

otherwise enjoy these areas, and to observe and appreciate the species at issue in their

natural habitat, is injured by the federal defendants' violations of the ESA and the APA

because these violations threaten these areas and the imperiled species living there.

28.    Plaintiff Surfrider Foundation ("Surfrider") is a non-profit, environmental

organization dedicated to the protection and enjoyment of the world's oceans, waves and

beaches for all people, through conservation, activism, research and education.  Represented

by over 50,000 members and over eighty Chapters worldwide, Surfrider is a grassroots

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                              12

organization whose members act locally to protect their community's coast. In California, Surfrider has twenty-two Chapters with over 30,000 members, and four Chapters in the vicinity of the Toll Road. The San Diego Chapter alone has over 7,200 members.

29.     All members of the Surfrider Foundation share a common bond and passion for protection and preservation of the coast and the marine environment, as well as protection of important recreational areas including the San Onofre State Beach, which is home to the World Championship Tour for professional surfing. The ability of Surfrider members to surf, hike, camp, swim, fish, birdwatch, and otherwise enjoy the flora, fauna and natural beauty in San Onofre State Beach and other areas where the Toll Road is planned to be located, and to observe and appreciate the species at issue in their natural habitat, is injured by the federal defendants' violations of the ESA and the APA because these violations threaten these areas and the imperiled species living there.

**B.    Defendants**

30.     Defendant Carlos Gutierrez is the Secretary of Commerce, and has ultimate responsibility for the decisions made by NMFS.

31.     Defendant James W. Balsiger is the Acting Assistant Administrator for Fisheries at NMFS, the agency within the Department of Commerce delegated the responsibility for implementing the ESA for certain marine species such as the southern steelhead trout.

32.     Defendant Dirk Kempthorne is the Secretary of the Department of Interior, and has ultimate responsibility for the decisions made by the FWS.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                           13

33.     Defendant Dale Hall is the Director of the FWS, the agency within the Department of the Interior delegated the responsibility for implementing the ESA for terrestrial and certain aquatic species.

## THE ENDANGERED SPECIES ACT

34.     Reflecting an "explicit congressional decision to afford first priority to the declared national policy of saving endangered species," the ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." Tennessee Valley Authority v. Hill, 437 U.S. 153, 180, 185 (1978).  Recognizing that certain species of plants and animals "have been so depleted in numbers that they are in danger of or threatened with extinction," 16 U.S.C. § 1531(a)(2), Congress enacted the statute to provide both "a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] a program for the conservation of such endangered species and threatened species . . . ." Id. § 1531(b).  The principal duties the Act imposes on the Secretary of the Interior for terrestrial species have been delegated to FWS, and the duties the Act imposes on the Secretary of Commerce for marine species such as the southern steelhead trout have been delegated to NMFS (collectively the "Services"). 50 C.F.R. §§ 402.01(b), 222.101(a).

35.     Under the ESA, a species is "listed" as "endangered" where it is "in danger of extinction throughout all or a significant portion of its range ...." 16 U.S.C. § 1532(6). A species is "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." Id. at § 1532(20). Once listed, a species is entitled to a number of critical protections under the Act.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                    14

36.    For example, the ESA requires that the FWS or NMFS take affirmative steps to protect and recover listed species – including designating critical habitat, i.e., (i) those areas occupied by a species at the time of its listing that contain the "physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection;" and (ii) those areas outside the area occupied by a species at the time of its listing that the Secretary has determined are "essential for the conservation of the species." 16 U.S.C. §§ 1533(a)(3); 1532(5)(A). The FWS and NMFS must also "develop and implement . . . 'recovery plans' . . . for the conservation and survival of endangered species," which must include the specific "management actions" necessary to recover the species. Id. § 1533(f)(1).

37.    Once a species is listed, it also becomes illegal to "take" any member of the species, id. § 1538(a)(1) – a term broadly defined to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or [ ] attempt to engage in any such conduct." Id. § 1532(19). Pursuant to the FWS's implementing regulations, the term "harass" further includes any "intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering." 50 C.F.R. § 17.3; see also id. (defining harm to include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering").

38.    A critical aspect of the ESA's protection for imperiled species is Section 7(a)(2), which requires all federal agencies, in consultation with FWS or NMFS, to "insure

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                                15

that any action[s] authorized, funded, or carried out" by such agencies are "not likely to jeopardize the continued existence of any endangered species [or] result in the destruction or adverse modification" of such species' designated critical habitat. 16 U.S.C. § 1536(a)(2). That consultation generally culminates in a Bi-Op prepared by the FWS or NMFS which determines "how the agency action affects the species or its critical habitat," id. § 1536(b)(3), and, in particular, "whether or not the federal action is likely to jeopardize the continued existence of listed species, or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.02.

39.    Any agency taking or authorizing an activity (hereafter the "action agency") that "may affect" listed species is required to engage in "formal consultation" with the FWS and/or NMFS, culminating in the issuance of a Bi-Op. Id. § 402.14. Only if the action agency concludes that the project is "not likely to adversely affect" a species, and the relevant Service provides a written concurrence with that conclusion, is consultation completed without a Bi-Op. Id. § 402.14(b).

40.    An essential component of the Bi-Op is the FWS or NMFS's analysis of the extent to which the proposed project will "incidental[ly]" "take" the species – i.e., not as the intended result of the project, but as an unintentional consequence of it. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). In determining the level of take and all other impacts associated with a project, including the extent to which mitigation measures will effectively reduce adverse impacts, NMFS and the FWS "shall use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). Where there is uncertainty regarding the impacts

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                    16

1    and mitigation measures, the ESA requires that the Services "give the benefit of the doubt to

2    the species." H.R. Conf. Rep. No. 697, 96th Cong., 2d Sess. 12 (1979).

3        41.    Once NMFS or the FWS has determined the level of take from the project

4    under consideration, the agency must then add those impacts to the "environmental

5    baseline," defined to include "the past and present impacts of all Federal, State or private

6    actions and other human activities in the action area . . . ." 50 C.F.R. § 402.02. This

7    baseline must include the amount of incidental take authorized in other Bi-Ops, as well as all

8    other threats the species faces. NMFS or the FWS must also incorporate the "indirect

9    effects" of the project, which are "those that are caused by the proposed action and are later

10   in time, but are still reasonably certain to occur." Id.

11       42.    If, after taking all the impacts into account, the Bi-Op concludes that

12   jeopardy or adverse modification of critical habitat may occur, the FWS or NMFS must

13   suggest those "reasonable and prudent alternatives which," if implemented, would prevent

14   such a violation. 16 U.S.C. § 1536(b)(3)(A). In any case, if any take of a listed species is

15   anticipated, the Bi-Op must include an "incidental take statement," which authorizes the

16   level of "take" that may occur as a result of the activity under consultation, identifies the

17   "reasonable and prudent measures" the agency must implement to minimize that take, and

18   sets forth the "terms and conditions" the agency must comply with to implement those

19   measures. Id. § 1536(b)(4); 50 C.F.R. § 402.14(i).

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                        17

## FACTS GIVING RISE TO PLAINTIFFS' CLAIMS

A.   **The Foothill-South Toll Road**

43.   Human activities, including residential and commercial development, agriculture, water diversions, and roads have destroyed and fragmented much of the habitat for species in Southern California. More than 95% of the historic riparian habitat in the region has already been lost. As a result, numerous species endemic to this area have been added to the ESA list of endangered and threatened species.

44.   Because many of the activities that can result in the taking of species and the destruction of their habitat are restricted on military lands, a large number of endangered and threatened species have remaining populations on Camp Pendleton Marine Base, a military reserve of more than 125,000 acres in northern San Diego County that includes coastal sage scrub, oak woodlands, chaparral, grasslands, coastal dunes, salt marshes, and more than 8,000 acres of riparian habitat. San Onofre State Beach – a rare 3,000-acre scenic coastal-canyon park – is also located in this area. Two sensitive riparian habitats – San Mateo Creek and San Onofre Creek – run through the State Beach and Camp Pendleton. Both of these creeks contain unique riparian and wetland habitat occupied by several endangered species.

45.   Within and north of Camp Pendleton lie several regional watersheds, including San Juan Creek, San Mateo Creek and San Onofre Creek. North of Camp Pendleton in these watersheds there are also significant undisturbed habitat areas containing remaining populations of listed species. At present these areas do not have a major highway of the sort that has inevitably resulted in serious adverse impacts to these species elsewhere.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                    18

46.     The Foothill/Eastern Transportation Corridor Agency ("TCA") – a public joint-powers agency formed to manage financing, construction and operation of the Toll Road at issue – is seeking authorization from the Federal Highway Administration ("FHWA") to construct a massive highway through these relatively undisturbed habitats in southern Orange County and northern San Diego County.  Running through some of the last remaining undeveloped areas in Southern California, the Toll Road will extend for sixteen miles and, according to the FWS Bi-Op, will range from 89 to more than 125 feet wide.

47.     This enormous project will involve extensive pre-construction investigations, including archeological surveys; enormous construction operations, including millions of cubic yards of cut and fill work that will cause massive hydrological alteration to the steep and extremely fragile watersheds traversed by the Toll road, as well as bridge construction over San Mateo Creek, San Onofre Creek and several other creeks with sensitive riparian areas; and perpetual maintenance of the new highway, including mowing, vegetation removal, and herbicide applications to maintain fences, access roads, and safety devices such as extensive lighting.

**B.     The Significant Threat The Toll Road Poses To Imperiled Species**

48.     Because the Toll Road is a project "authorized, funded, or carried out" by a federal agency that may adversely affect ESA listed species, 16 U.S.C. § 1536(a)(2), the FHWA prepared a Biological Assessment ("BA") on the impacts of the road. Id. § 1536(c). The BA only cursorily evaluated the threats that the Toll Road poses to protected species.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                    19

49.    The FHWA subsequently requested ESA Section 7 consultation with NMFS and the FWS. As a result of an "informal consultation," 50 C.F.R. § 402.13, NMFS issued a written concurrence with the FHWA that the Toll Road is not likely to adversely affect the critically endangered southern steelhead trout.

50.    The FHWA did enter into "formal consultation" with the FWS, id. § 402.14, which prepared a draft Bi-Op for FHWA and TCA's review. That review, and the objections raised by the project proponents, led to significant revisions in the Bi-Op – revisions that made the project appear less harmful to imperiled species, but did so by ignoring or downplaying critical issues that had been candidly addressed in the earlier draft. In the final Bi-Op the FWS recognized that the Toll Road is likely to adversely affect species within its jurisdiction, and recommended that TCA consider alternatives further West "that will have less impact on federally protected species." Nonetheless, the agency concluded that the project is not likely to jeopardize the continued existence of the Pacific pocket mouse, tidewater goby, arroyo toad, least Bell's vireo, coastal California gnatcatcher, or the thread-leaved brodiaea.

1.    **The Southern Steelhead And NMFS's Decision Not To Even Complete Formal Consultation For the Species**

51.    The west coast southern steelhead (*Oncorhynchus mykiss* or *O. mykiss*) is part of a complex species of trout found in rivers and streams along the Pacific coast. Some forms of the species, referred to as "rainbow" trout, spend their entire life in fresh water while the steelhead are anadromous and thus undergo the transformations necessary to migrate from fresh water, where they are born, to the ocean and return to spawn years later.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                    20

52.    In 1997 NMFS listed 15 Evolutionarily Significant Units ("ESU") of west coast steelhead under the ESA.  62 Fed. Reg. 43,937 (Aug. 18, 1997).  Two of those ESUs, including one in Southern California, were listed as endangered.

53.    In listing the species NMFS recognized that urbanization and habitat degradation – and especially "[s]edimentation from land use activities" – are among the most pressing threats the species faces, and noted that over 90% of wetlands in California have been lost.  The agency also recognized that changes in "climatic conditions have exacerbated the problems."  In addition, NMFS explained that fires are "likely to be a significant risk to the steelhead in this ESU."  In light of these threats, and especially given the extremely low population size of the Southern California ESU – estimated at the time of listing to be less than 200 adults in each of six streams – NMFS explained that the "sustainability of steelhead populations in the Southern California ESU continues to be a major concern."

54.    At the time of the original listing NMFS did not acknowledge the presence of the steelhead south of Malibu Creek, which is north of Santa Monica.  In 2000, steelhead were documented in two areas further south, including San Mateo Creek, of which approximately 6-7 miles are accessible to the species.  Subsequent to that discovery, NMFS concluded that the San Mateo Creek population should be considered as part of the larger southern California ESU, and emphasized the importance of maintaining smaller streams "for range expansion and recovery after drought or other perturbations that reduce population numbers."  Accordingly, the species listing was expanded to the U.S-Mexico border.  67 Fed. Reg. 21,586 (May 1, 2002).

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                    21

55.     In re-evaluating the status of the steelhead in recent years, NMFS reaffirmed that the Southern California steelhead ESU – now called a "Distinct Population Segment" ("DPS") – remains critically imperiled. 71 Fed. Reg. 834 (Jan. 5, 2006). Recognizing that various activities, including "road construction, urban development, mining, agriculture, ranching and recreation have significantly altered steelhead habitat quantity and quality," NMFS stressed the "extremely high risks" to the population's survival. Accordingly, while the other steelhead DPS's were listed only as "threatened," NMFS reaffirmed that the Southern California steelhead DPS remains an "endangered" species.

56.     When NMFS listed the species in San Mateo Creek in 2002, the agency recognized that the Foothill-South Toll Road posed risks to the species, and stated that the agency expected the FHWA to undertake "an ESA section 7 consultation with us to ensure that construction and operation of the project does not jeopardize anadromous *O. mykiss* and that any impacts are minimized."

57.     However, instead of engaging in formal consultation and preparing a Bi-Op on the adverse impacts of the Toll Road on the steelhead trout, in May, 2007 NMFS sent a short letter (the "May 2007 Concurrence") concurring in FHWA's contention that formal consultation and a Bi-Op are unnecessary because the Toll Road is not likely to adversely affect the species.

58.     In the May 2007 Concurrence NMFS recognized that the Toll Road will cross San Mateo and San Juan Creek, "both of which are within the [DPS] of endangered Southern California steelhead, and designated critical habitat for this species." The agency further noted that bridge piers will be placed in the Creeks.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                    22

59.     Nonetheless, NMFS concluded that formal consultation and a Bi-Op were unnecessary because creek channels are "expected to be dry for the majority of the construction period." NMFS did not address the likelihood that any harm, harassment or other "take" of steelhead might occur during the rest of the construction period, which will take place when the channels are inundated and steelhead are present. Instead, NMFS relied on undefined "best management practices" that are supposed to "minimize impacts during construction of the highway and bridges," without explaining what those practices will consist of, or demonstrating that they will eliminate all adverse effects to the steelhead.

60.     NMFS also downplayed the significant risk that the Toll Road will impair water quality through increased delivery of sediment and pollutants into the Creeks. In addition to creating a new source of roadway runoff, the Toll road will require 41 million yards of cut and fill – with cuts up to 800 feet wide and 250 feet high (i.e., the size of a 20-story building) – in fragile, steep terrain highly prone to erosion when disturbed.

61.     Sediment deposits are a serious threat to species such as the steelhead, reducing the survival of embryos and the emergence of fry from redds (nests in the riverbed) by decreasing dissolved oxygen and water exchange and entrapping emerging fry. NMFS appears to have relied on TCA's plan to use "extended detention basins" and revegetation to protect against these impacts. However, the extended detention basins can generally be expected to trap less than half of the suspended sediment from the roadway, and sediment laden runoff from adjacent disturbed areas, including the large cut and fill slopes, will be discharged directly to the Creeks without any treatment in extended detention basins. As for revegetation, the FWS ignored TCA's demonstrated lack of success with revegetation in

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                    23

1   other road projects, and in any event failed to even consider whether revegetation can work

2   for the massive scale of proposed disturbance of the steep, extremely fragile watersheds

3   affected by the Toll Road.

4

5        62.    NMFS's Concurrence also failed to address other threats to the species that

6   the Toll Road will exacerbate. For example, in listing the species NMFS acknowledged the

7   "significant risk" from fires in this area, yet the May 2007 Concurrence completely ignores

8   the fire risks associated with the road – risks which the FWS has at least acknowledged in

9   its Bi-Op. NMFS also ignored any long-term effects from the permanent structures that will

10  be placed in the Creek, including whether they will make fish passage more difficult.

11

12       2.    **Species Under The Jurisdiction of the FWS
             And That Agency's Biological Opinion**

13

14            A.    **The Species At Issue**

15

16                 1.    **The Pacific Pocket Mouse**

17       63.    The Pacific pocket mouse (*Perognathus longimembris pacificus*) is among

18  the smallest mammals known to hibernate, and spends much of its time below ground in

19  burrows resting and hoarding food. Members of the species can spend long periods of time

20  in these burrows, and their population numbers can vary widely depending on food

21  availability and other conditions. Because these factors make it difficult to obtain accurate

22  data on the species' presence in an area, recent research indicates that at least six nights of

23  continuous surveys, repeated three times between spring and fall, are necessary for a

24  reasonable degree of confidence as to the species' presence or absence in an area.

25

26

27

28  COMPLAINT FOR DECLARATORY AND
    INJUNCTIVE RELIEF                  24

64.     Only four populations of the Pacific pocket mouse ("pocket mouse") remain – one at the Dana Points Headlands in southern Orange County ("Dana Point" population), two near San Mateo Creek in the Toll Road project area ("San Mateo North" and "San Mateo South" populations), and a fourth in the Southern portion of Camp Pendleton in the Oscar One Training Area (called the "Oscar One" population).  The Bi-Op explains that the Dana Point population is located on private land "totally isolated by development" and its status "is uncertain," and that the Oscar One population is in an area "actively used for recruit training and includes an extensive training/obstacle course, live firing ranges," and other facilities.

65.     According to the FWS's 1998 Recovery Plan for the pocket mouse, the "degradation of any of the populations at the . . . known extant locales could irretrievably diminish the likelihood of the subspecies' survival."  Accordingly, the Recovery Plan emphasizes that "[p]opulation persistence and expansion should be maintained by precluding actions which result in physical barriers to movement, habitat fragmentation, or an increase in edge effects."

### 2.     The Tidewater Goby

66.     The tidewater goby (*Eucyclogobius newberryi*) is a small, elongate fish no larger than 1 inch in length.  Gobies are nearly transparent, and are generally restricted to brackish water in coastal lagoons and streams.  To reproduce, in Spring the males dig a nesting burrow several inches deep. Females lay their eggs into the burrow, and the males then remain to guard the eggs.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                             25

67.    The species has already been extirpated from many of its historic habitats, and the only known remaining goby populations south of Malibu Creek are on Camp Pendleton and San Onofre State Beach.  The goby occupies San Mateo and San Onofre Creeks, both of which the Toll Road will cross.  The gobies in these Creeks are already threatened by non-native predators, such as exotic fish, frogs and other animals.

68.    In the 2005 Recovery Plan for the goby the FWS identified roadways and bridges as another specific threat facing the species, as a result of stream channeling, water flow impacts and habitat degradation including sedimentation.

### 3.    The Arroyo Toad

69.    The arroyo toad (*Bufo californicus*) is a small dark-spotted toad that requires shallow, slow-moving streams and riparian habitats with natural flooding regimes, as well as adjacent upland habitats that include alluvial scrub, coastal sage scrub, chaparral, grasslands and oak woodlands to breed and survive.   Toads reproduce from February to July on streams with persistent water, with eggs developing in shallow pools with minimal current and little or no vegetation.  Upon hatching the larvae are essentially immobile for 5 to 6 days, after which they begin to disperse to shallow water for the next 10 weeks.  They undergo metamorphosis 10 weeks later.

70.    Already extirpated from 75 % of their range, arroyo toads remain primarily in small, isolated areas in the middle and upper reaches of streams.  The few remaining low elevation coastal toad populations are on Camp Pendleton and San Onofre State Beach – along San Mateo Creek, Cristianitos Creek, and San Juan Creek, within the vicinity of the Toll Road crossing there.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                          26

71.     In the 1999 Recovery Plan for the species the FWS explained that the arroyo toads in this area are threatened by "aquatic predators (especially green sunfish and bullfrogs), sand and gravel mining, road construction and traffic, livestock grazing on private lands, and military activities (especially training in the riparian zones)." The agency also identified "road construction, maintenance, and use" as one of the specific threats facing the species.

### 4.     The Coastal California Gnatcatcher

72.     The coastal California gnatcatcher (*Polioptila californica californica*) is a small, long-tailed bird in the thrush family whose remaining habitat is limited to Southern California and Baja California, Mexico. The gnatcatcher is an insect-eating species found principally in coastal sage scrub habitat, on which it relies for breeding and feeding. As the Bi-Op explains, "coastal sage scrub is one of the most depleted habitat types in the U.S.," with as much as 90% already lost to development and habitat conversion. Habitat destruction and fragmentation are the principal threats facing the gnatcatcher, which has been listed as a threatened species under the ESA since 1993, and, accordingly, the Bi-Op explains that most important "conservation effort[ ]" for the species is "preserving relatively large, contiguous patches of coastal sage scrub suitable for gnatcatchers."

73.     During several catastrophic wildfires in 2007, more than 100,000 acres of coastal sage scrub habitat were lost in Orange and San Diego counties, including approximately one-third of the habitat on Camp Pendleton. Current training activities on Camp Pendleton already produce a "high return rate of wildfires" and the proposed Toll road will further increase wild fire risks.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                              27

### 5.    The Least Bell's Vireo

74.    The least Bell's vireo (*Vireo belii pusillus*) is a small migratory songbird found in Southern California from approximately mid-March to late September. Habitat destruction and other developments have seriously threatened the species, which was listed as "endangered" in 1986.

75.    The largest remaining population of vireo is found on Camp Pendleton and San Onofre State Beach, and "high numbers of breeding vireo" are located near San Onofre and San Mateo Creeks. In addition, the species has been documented near several of the other Creeks the Toll Road will cross. According to the Bi-Op the vireo in these areas are already threatened by construction and military activities that degrade or destroy riparian habitat, groundwater pumping, exotic plant invasion, and predation.

### 6.    The Thread-leaved Brodiaea

76.    The thread-leaved brodiaea (*Brodiaea filifolia*), a perennial herb in the Lily family found only in southwestern California, is principally threatened by habitat destruction and fragmentation, and has been found in 11 locations in the Toll Road project area. Three of those locations will be impacted, and one destroyed, when the Toll Road is constructed, affecting up to 180 individual plants. The Toll Road may also adversely affect suitable brodiaea habitat.

**B.**  **Deficiencies In The FWS's Bi-Op**

    **1.**  **The Bi-Op Ignores Or Downplays Serious Impacts To Listed Species**

77.    The FWS's Bi-Op fails to address several critical threats the Toll Road poses to protected species. Some of these threats were recognized in the draft Bi-Op, but their treatment was significantly amended at the request of the project proponents.

78.    For example, with respect to the pocket mouse, the draft Bi-Op acknowledged that the Toll Road and its high volume of traffic will create an insurmountable barrier between the San Mateo North and South populations. Although an existing two lane road – Cristianitos Road – already divides the populations, the FWS explained that members of the species "have been observed successfully crossing" such a two lane paved road in the past, and thus that this road is not a barrier to such movements.

79.    Consequently, the draft Bi-Op concluded that the Toll Road will for the first time "isolate animals on the east and west side of [the road] from one another and result in the effective loss of habitat to the east of the roadway from animals on the western side of the toll road alignment." The draft Bi-Op further explained that the TCA's plan to construct a wall in order to keep the animals from being hit on the roadway will only "exacerbate the fragmenting and isolating effect of the roadway." Finally, the draft Bi-Op rejected TCA's plan to build underpasses for the species as unlikely to be used by the Pacific pocket mouse.

80.    The FWS's discussion of the impact of Cristianitos Road on the pocket mouse changed dramatically in the final Bi-Op. Without explaining how or why the agency had changed its mind, the final Bi-Op states that because of Cristianitos Road the two

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                          29

pocket mouse populations are already "completely isolated," and thus that despite the change from a two-lane road (which animals have been documented crossing) to a six lane highway, "the connectivity of the population will not worsen with the proposed project."

81.     The FWS also inexplicably ignores pocket mouse habitat loss that the agency had recognized in the draft Bi-Op. While the draft explained that the Toll Road would destroy more than 50% of the high quality Pacific pocket mouse habitat in the area of the San Mateo North population, and thus "would appreciably increase the vulnerability of this population to extirpation," the final Bi-Op completely omits this discussion.

82.     The final Bi-Op contains a similar inexplicable omission for the arroyo toad: while the draft Bi-Op recognized that more than 450 acres of upland habitat near toad populations in San Mateo Creek (within Camp Pendleton and San Onofre State Beach), and Cristianitos Creek (within Orange County) will be lost, in the final Bi-Op the FWS reduces that number to approximately 100 acres, without explaining the change.

83.     The Bi-Op also ignores threats that certain species are already facing. For example, although in a 1995 Bi-Op for Marine Corps activities the FWS issued an incidental take statement permitting the take of 150 tidewater gobies per year on Camp Pendleton, in the Toll Road Bi-Op the FWS never considers that specific impact as part of the baseline on which to add the additional adverse impacts of the Toll Road.

84.     Similarly, in the 1995 Marine Corps Bi-Op the FWS reached its no jeopardy conclusion in significant part based on mandatory terms and conditions requiring the Marine Corps to implement a Riparian Ecosystem Conservation Plan designed to protect species in areas where the Toll Road is being developed. For example, the Plan required the Marine

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                    30

1   Corps to "[p]rovide for largely unimpeded hydrologic and sedimentary floodplain dynamics"

2   and further mandated that "[n]ative riparian plant communities shall be maintained by

3   natural processes and not be artificially manipulated, except as needed to restore depleted

4   natural resources." The Toll Road Bi-Op does not consider the relationship between these

5   terms and conditions and the activities permitted for the Toll Road itself, which permit the

6   very kind of impacts that were prohibited in order to conclude that Marine Corps' activities

7   are not likely to jeopardize listed species.

8

9                    **2.    Even With Respect To Adverse Impacts The FWS**
10                          **Recognized, The Agency Unlawfully Relies Upon Vague**
                          **And Uncertain Mitigation Plans**
11

12       85.    Despite these omissions, the final Bi-Op continues to recognize that the Toll

13   Road will have serious adverse impacts on listed species, and suggests that without stringent

14   measures to mitigate and avoid these impacts, the Toll Road may in fact jeopardize the

15   continued existence of one or more listed species. The Bi-Op then refers to measures meant

16   to accomplish this mitigation objective.

17

18       86.    However, rather than detail specific mitigation plans and how they will

19   successfully ameliorate the serious adverse impacts that the Toll Road will have on these

20   species, the FWS relies on various species Resource Management Plans ("RMPs") that have

21   yet to be developed. According to the Bi-Op, the FWS will review and approve these plans

22   at some point in the future, apparently outside the context of the Section 7 consultation

23   process.

24

25       87.    Even the mitigation plans outlined in the Bi-Op are far too vague and

26   uncertain, and in many instances the Bi-Op itself indicates that they will fail. For example,

27

28   COMPLAINT FOR DECLARATORY AND
     INJUNCTIVE RELIEF                        31

1  to mitigate the Toll Road's destruction and fragmentation of Pacific pocket mouse habitat,

2  the Bi-Op provides that the TCA will undertake habitat management and restoration in

3  other areas.  However, elsewhere in the Bi-Op the FWS recognizes that "the proposed

4  
5  habitat enhancement largely remains experimental and the techniques have been

6  unsuccessful, to date."

7       88.    The other measure designed to address Pacific pocket mouse habitat

8  fragmentation is undercrossings meant to maintain connectivity between the San Mateo

9  
10  North and South populations.  But in the Bi-Op the Service concludes that "the

11  undercrossings or culverts will be ineffective at conveying [pocket mice] under the

12  roadway."

13       89.    Similarly, although TCA plans to use live trapping and translocation to

14  reduce the chances of mice being killed during construction, the Bi-Op recognizes that these

15  
16  activities themselves risk injuring or killing animals, and that efforts to translocate similar

17  species "have had limited success."  And with regard to a curb barrier meant to keep Pacific

18  Pocket mice off the road, the Bi-Op explains that the agency cannot "evaluate the potential

19  efficacy of this measure since detailed plans for its implementation are not yet developed."

20  Thus, the no jeopardy conclusion for Pacific pocket mouse relies on the success of

21  
22  mitigation measures that, according to the Bi-Op itself, are either unproven, ineffective, or

23  undeveloped.

24       90.    The proposed measures to protect the tidewater goby are similarly vague and

25  uncertain.  For example, the species occupies San Mateo and San Onofre Creeks, both of

26  which the Toll Road will cross, requiring both temporary construction in these occupied

27  
28  COMPLAINT FOR DECLARATORY AND
    INJUNCTIVE RELIEF                    32

habitats, as well as permanent alterations in the species' habitats in both Creeks. To offset

the significant adverse impacts associated with excavating the creekbed in San Onofre creek,

the Bi-Op states that a channel diversion will be created that "will remain open and

accessible to gobies during construction activities," without discussing the likelihood that

the species will utilize such newly created habitat, or whether it will even include the specific

habitat characteristics the species prefers – i.e., shallow brackish water with salinities of less

than 10 parts per thousand.

91.    As with other species, the FWS is also relying upon a "capture and relocation

plan" for individual gobies caught in areas to be dewatered, but the Bi-Op does not consider

the likelihood of success of such efforts. The Bi-Op similarly discounts the risks of runoff

and siltation on the goby (which the Bi-Op recognizes can "smother[ ] goby eggs,"

"reduc[e] visibility for predator avoidance," and "decreas[e] available oxygen in the water

for goby restoration") and the arroyo toad (a species that TCA itself acknowledges is

"particularly sensitive to (fine) sediment" during its "reproductive and early development

stages") through reliance on vague and undefined "best management practices," such as

using detention basins to filter roadway runoff and revegetating disturbed areas. However,

the Bi-Op does not consider the lack of success of revegetation as a mitigation measure for

other TCA projects, or include any meaningful discussion of the magnitude of likely

sedimentation impacts – or the efficacy of the proposed mitigation measures – given the

massive proposed disturbance and the fragility of the affected terrain.

92.    The FWS's other efforts to mitigate threats to the arroyo toad have similar

fundamental defects. As the Bi-Op explains, in addition to the "death or injury of individual

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                           33

toads from construction of the road at bridge creek crossings and within the upland project areas," the Toll Road will fragment toad habitat by cutting the species off from documented upland habitat on the West side of Cristianitos and San Mateo Creeks.

93.    The TCA proposes to address this habitat fragmentation by constructing underpasses to connect habitat areas.  Given their placement and length (over 100 meters long), however, in the Bi-Op the FWS recognizes that there is no scientific basis to conclude the species will use them.

94.    Similarly, to prevent toads from entering the roadway – which "parallels a substantial length of Cristianitos and San Mateo creeks that support a significant population of toads" – TCA plans to construct a "toad exclusionary fence" in toad habitat.  However, the FWS recognizes that the fence can only work so long as no "burrowing animals have undermined the fence, no openings in the mesh are present, no debris or soil has piled up to form a 'ramp," and, most critically, "the toads are unable to climb the mesh."  Yet, rather than requiring some assurance that these problems will not fatally undermine the fence's utility, the Bi-Op relies on the preparation of a future "management plan" to address these critical issues as well.

95.    With regard to the least Bell's vireo, the Toll Road will destroy more than 22 acres of vireo habitat, including more than 13 acres along the Creek that "have a high likelihood of supporting nesting vireo."  Although the Bi-Op provides that riparian habitat will "typically" be removed outside vireo breeding season, the FWS does not prohibit clearing during this period.  Instead, the Bi-Op vaguely asserts that if removal occurs during breeding "measures will be implemented to avoid impacts to vireo nests and young."

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                    34

96.     As regards the gnatcatcher, the Toll Road will destroy more than 300

additional acres of coastal sage scrub habitat, including more than 200 acres on Camp

Pendleton.  Upwards of 50 breeding pairs of gnatcatchers presently occupy this habitat.  The

Toll Road will also increase gnatcatcher habitat fragmentation, because it will reduce east -

west movement of the species by causing "fewer gnatcatchers to attempt to cross the road

and increased mortality for individuals that attempt to cross."

97.     The TCA proposes to mitigate for this habitat destruction by using

conservation "credits" associated with an inland restoration site.  However, the Bi-Op does

not explain how the inland site can adequately compensate for the unique and preferable

coastal habitat to be lost for the Toll Road, which provides higher reproductive rates, lower

winter mortality, and greater resistance to habitat degradation.

98.     As for the brodiaea, while the FWS acknowledges that the Toll Road will

destroy one of the few remaining populations, the agency accepts a vague plan to mitigate

that destruction by translocating the affected plants, even though the translocation site has

not even been determined, and the FWS recognizes that this effort may well not be

successful.

99.     As for the risk of fires, which can cause severe adverse impacts to all of these

listed species, the Bi-Op similarly relies on TCA's generic "commitment to develop a

fire/prevention/fire response strategy," rather than identifying the specific steps that will be

taken to minimize the fire risks associated with the Toll Road, or explaining how those steps

will be superior to those taken for the north section of the road, where, according to the Bi-

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                    35

Op, "a series of four fires have burned the majority of the surrounding open space since 1996."

### 3.    Additional Deficiencies In The FWS's Analysis

100.    The FWS has also failed to use the "best available science" for several species – most notably the pocket mouse and the toad – by relying on outdated surveys and survey techniques in evaluating the impacts of the Toll Road on species.   For example, no recent surveys have been conducted for the toad in the area of the Toll Road.

101.    The Bi-Op also recognizes that most surveys for the Pacific pocket mouse in San Mateo North occurred many years ago and more recent focused surveys "did not use appropriate methods for population estimation."  As a result the Bi-Op recognizes that the agency cannot "make reliable inferences about population size or dynamics at the site."  In addition, the FWS apparently surveyed for the pocket mouse based on a five night protocol, while recent studies demonstrate that in light of the species' unique habitat uses, at least six nights of continuous monitoring repeated three times between Spring and Fall is necessary.

102.    The Bi-Op also ignores any growth-inducing effects that may be caused by the presence of a new highway in the area.  Because the Toll Road will reasonably lead to further development – and concomitant habitat destruction – in the area, the Service must analyze those effects in the Bi-Op.

103.    In the Bi-Op the FWS also fails to meaningfully analyze the impacts of the Toll Road on the recovery of listed species, as required by the ESA.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                              36

104.    The Bi-Op also fails to provide any discussion or analysis regarding the possible effects that climate change might have on the listed species at issue and their habitats.

105.    In light of these myriad deficiencies in the FWS's Bi-Op, the agency lacked a sufficient basis to conclude that the Toll Road is not likely to jeopardize listed species. Similarly, the Service lacked an adequate scientific basis to determine the levels of incidental take that might occur as a result of the project.

## PLAINTIFFS' CLAIMS FOR RELIEF

### First Claim
### (NMFS)

106.    By concurring with the FHWA's determination that the Toll Road is not likely to adversely affect the southern steelhead trout, and refusing to even engage in formal consultation or prepare a Biological Opinion on that basis, despite evidence that the Toll Road poses significant threats to the species in San Mateo Creek, NMFS has violated the ESA, 16 U.S.C. § 1536(a)(2), and has therefore acted in a manner that is arbitrary and capricious and contrary to law in violation of the APA.  5 U.S.C. § 706.

107.    These legal violations are injuring plaintiffs in the manner described in ¶¶ 8-29 above.

### Second Claim
### (FWS)

108.    By issuing a Biological Opinion that fails to rely on the "best scientific and commercial data" available, including the Service's own Recovery Plans and other previous assessments of the species, the FWS has violated the ESA, 16 U.S.C. § 1536(a)(2), and has

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF                    37

1  therefore acted in a manner that is arbitrary and capricious and contrary to law in violation

2  of the APA.  5 U.S.C. § 706.

3
4        109.    By ignoring or downplaying certain adverse impacts of the Toll Road on

5  listed species, and relying on speculative and undefined mitigation measures to address

6  others, the FWS has violated the ESA, 16 U.S.C. § 1536(a)(2), and has therefore acted in a

7  manner that is arbitrary and capricious and contrary to law in violation of the APA.  5

8  U.S.C. § 706.

9
10       110.    By failing to consider the full extent of the threats presently facing the listed

11  species within the Toll road project area, and the true extent of the direct and indirect

12  threats the Toll Road poses to these species and their recovery, the FWS has violated the

13  ESA, 16 U.S.C. § 1536(a)(2), and has therefore acted in a manner that is arbitrary and

14  capricious and contrary to law in violation of the APA.  5 U.S.C. § 706.

15
16       111.    These legal violations are injuring plaintiffs in the manner described in ¶¶ 8-

17  29 above.

18       WHEREFORE, plaintiffs respectfully request that this Court:

19       (1)    declare that the federal defendants have violated, and continue to violate, the

20  ESA and the APA;

21
22       (2)    set aside NMFS May 23, 2007 Concurrence on the impacts of the Toll Road

23  on the southern steelhead trout;

24       (3)    set aside the FWS's April 30, 2008 Biological Opinion on the impacts of the

25  Toll Road on the Pacific pocket mouse, tidewater goby, arroyo toad, least Bell's vireo,

26  coastal California gnatcatcher, and thread-leaved brodiaea;

27
28  COMPLAINT FOR DECLARATORY AND
    INJUNCTIVE RELIEF                    38

1   (4)    retain jurisdiction of this matter until the federal defendants have fulfilled all

2   of their legal obligations under the ESA and the APA;

3

4   (5)    award plaintiffs their costs, attorneys' fees, and other disbursements for this

5   action, including any expert witness fees; and

6   (6)    grant plaintiffs such other and further relief as the Court may deem just and

7   proper.

8

9   DATED:  AUGUST 13, 2008                    Respectfully submitted,

10

11

12                    *Damon K. Nagami*

13   DAMON NAGAMI, Cal. Bar. No. 217089
     JOEL R. REYNOLDS, Cal. Bar. No. 85276

14   Natural Resources Defense Council, Inc.
     1314 Second Street

15   Santa Monica, California 90401
     (310) 434-2300

16

17

18   HOWARD M. CRYSTAL, D.C. Bar. No. 446189
     ERIC R. GLITZENSTEIN, D.C. Bar No. 358287

19   Meyer Glitzenstein & Crystal
     1601 Connecticut Avenue, N.W., Suite 700

20   Washington, D.C.  20009
     (202) 588-5206

21

22   BRIAN SEGEE, Cal. Bar. No. 200795

23   Defenders of Wildlife
     1130 Seventeenth St., N.W.

24   Washington, D.C.  20036
     (202) 772-3221

25

26   *Attorneys for plaintiffs*

27

28   COMPLAINT FOR DECLARATORY AND
     INJUNCTIVE RELIEF                    39

1   Of counsel:

2   Michael D. Fitts
3   Cal. Bar No. 145114
    1718 Esplanade #523
4   Redondo Beach, CA 90277
5   (310) 947-1908
    (310) 373-1715 (fax)
6   gostodas1@yahoo.com

7   *Attorney for Plaintiff Endangered Habitats League*

8

9   Angela T. Howe
    Cal Bar. No. 239224
10  P.O. Box 6010
11  San Clemente, CA 92674

12  (949) 492-8170 ext. 414

13  *Attorney for Plaintiff Surfrider Foundation*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  COMPLAINT FOR DECLARATORY AND
    INJUNCTIVE RELIEF                    40

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

SEE ATTACHED

**(b)** County of Residence of First Listed Plaintiff  SAN DIEGO
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

**DEFENDANTS** 2008 AUG 13  AM 9: 01

SEE ATTACHED

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

**08 CV 1470 JAH RBB**

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☒ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☒ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

**V. ORIGIN** (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
16 U.S.C. s. 1536(a)(2) and 5 U.S.C. s. 706

Brief description of cause:
violations of the Endangered Species Act relating to highway

**VII. REQUESTED IN COMPLAINT:**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23  DEMAND $ _____  CHECK YES only if demanded in complaint:  JURY DEMAND: ☐ Yes  ☒ No

**VIII. RELATED CASE(S) IF ANY**  (See instructions):  JUDGE _____  DOCKET NUMBER _____

DATE  08/13/2008

SIGNATURE OF ATTORNEY OF RECORD  *Damon K. Nagami*

**FOR OFFICE USE ONLY**

RECEIPT # 153961  AMOUNT $350  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

TAC  8/13/08

I.    PLAINTIFFS

Save San Onofre Coalition, California Coastal Protection Network, California State Parks Foundation, Defenders of Wildlife, Endangered Habitats League, Laguna Greenbelt, Inc., National Audubon Society d/b/a Audubon California, Natural Resources Defense Council, Inc., Orange County Coastkeeper, Sea and Sage Audubon, The Sierra Club, and Surfrider Foundation

Attorneys:

DAMON NAGAMI, Cal. Bar. No. 217089
JOEL R. REYNOLDS, Cal. Bar. No. 85276
Natural Resources Defense Council, Inc.
1314 Second Street
Santa Monica, California 90401
(310) 434-2300

HOWARD M. CRYSTAL, D.C. Bar. No. 446189
ERIC R. GLITZENSTEIN, D.C. Bar No. 358287
Meyer Glitzenstein & Crystal
1601 Connecticut Avenue, N.W., Suite 700
Washington, D.C. 20009
(202) 588-5206

BRIAN SEGEE, Cal. Bar. No. 200795
Defenders of Wildlife
1130 Seventeenth St., N.W.
Washington, D.C. 20036
(202) 772-3221

DEFENDANTS

CARLOS GUTIERREZ, Secretary, Department of Commerce, JAMES BALSIGER, Acting Assistant Admin. for Fisheries, National Marine Fisheries Service, DIRK KEMPTHORNE, Secretary, Department of Interior and DALE HALL, Director, Fish and Wildlife Service

**UNITED STATES
DISTRICT COURT**
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

**# 153961     — TC**

**August 13, 2008
08:55:24**

**Civ Fil Non-Pris**
USAO #.: 08CV1470
Judge..: JOHN A HOUSTON
Amount.:                    $350.00 CK
Check#.: BC11083

**Total—>   $350.00**

FROM: SAVE SAN ONOFRE COALITION
      VS
      CARLOS GUTIERREZ